<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

|  |  |  |
|---|---|---|
| LAURA SILVER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 05-4308 (JAG) |
| | : | |
| JO ANNE B. BARNHART, | : | **OPINION** |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

<u>GREENAWAY, JR., U.S.D.J.</u>

Plaintiff Laura M. Silver ("Plaintiff") seeks review of the Commissioner of Social Security Administration's ("Commissioner") decision denying her application for Supplemental Security Income ("SSI") benefits, pursuant to 42 U.S.C. § 405 (g).[1] Plaintiff argues that the Commissioner's decision is not supported by substantial evidence and should be reversed. For the reasons set forth in this Opinion, this Court finds that the Commissioner's decision is not supported by substantial evidence and must be reversed and remanded.

## I. <u>PROCEDURAL HISTORY</u>

On June 7, 2000, Plaintiff filed an application for SSI benefits, claiming disabilities of severe asthma, lower back impairment, diabetes mellitus, plantar fasciitis (left heel spur),

---

[1] This section of the Social Security Act (hereinafter the "Act") provides that any individual may obtain a review of any final decision of the Commissioner made subsequent to a hearing to which s/he was a party. The federal district court for the district in which the plaintiff resides is the appropriate place to bring such action. 42 U.S.C. § 405(g).

gastrointestinal problems, a hernia, depression, and anxiety. (Tr. 21, 162, 187, 1381, 1412, 1414, 1417, 1418, 1420, 1425.)[2]  Following the Social Security Administration's denial of Plaintiff's application on August 23, 2000, Plaintiff filed a request for reconsideration on October 24, 2000. (Tr. 51, 57.)   Plaintiff's request for reconsideration was denied on April 16, 2001. (Tr. 63.)

Plaintiff thereafter requested a hearing, and appeared before Administrative Law Judge Christopher P. Lee ("ALJ Lee") on July 23, 2002.  (Tr. 1452.)  ALJ Lee issued his decision on June 6, 2003, finding that Plaintiff was not disabled, and that her non-exertional impairments did not significantly compromise her ability to perform light work, which did not require exposure to dust, fumes, and environmental irritants.  (Tr. 33- 40.)  On July 15, 2003, Plaintiff requested that the Appeals Council review the ALJ's decision.  (Tr. 83.)  The Appeals Council granted review and remanded the case for further proceedings.  Specifically, the Appeals Council ordered the ALJ to give further consideration to Plaintiff's residual functional capacity for the time at issue, provide references to the record in support of these findings, and explain the weight given to the opinion evidence.  (Tr. 87.)  The order further instructed the ALJ to obtain evidence from a medical expert and vocational expert to clarify the nature and severity of Plaintiff's impairments, and the effect these limitations have on the existence of other jobs in the national economy that Plaintiff can perform.  (Id.)

The ALJ held a hearing on remand on December 9, 2004, at which time Plaintiff, medical expert Dr. Harold Bernanke, M.D., and vocational expert Donald Slive, provided testimony.  (Tr.

---

[2]  The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to such transcript.

1409.)  ALJ Lee issued a decision on March 21, 2005, presenting the following summary of his

findings:

1. The claimant never engaged in substantial gainful activity.

2. The claimant's asthma, diabetes mellitus, plantar fasciitis and gastrointestinal problems are considered "severe" based on the requirements in the Regulations (20 C.F.R. §  416.920(b)).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible.

5. The claimant has the residual functional capacity to perform, at best, sedentary work. She is also precluded from engaging in activities that require exposure to dust, fumes, and environmental irritants.

6. The claimant has no past relevant work (20 C.F.R. § 416.965).

7. The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. § 416.967).

8. The claimant has "a limited education" (20 C.F.R. §416.964).

9. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 C.F.R. § 416.967).

10. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.24 as a framework for decision-making, there are a significant number of jobs in the national economy that she can perform. Such jobs include but are not limited to: surveillance system monitor, charge account clerk, and document preparer, which exist in significant numbers in the local and national economies.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 416.920(f)).

(Tr. 26.)  Based on these findings, ALJ Lee concluded that Plaintiff was not eligible for SSI

under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.  (Tr. 26.)  On July 12, 2005,

Administrative Appeals Judge Rodney V. Tapp denied Plaintiff's request for review of ALJ

Lee's decision.  (Tr. 9.)  Plaintiff filed the instant action, seeking reversal of the Commissioner's

decision, pursuant to 42 U.S.C. §§ 1383(c)(3) and  405(g).

## II. <u>STATEMENT OF THE FACTS</u>.

### A.   <u>Background</u>

Plaintiff Laura M. Silver was born on February 20, 1960, and has a tenth grade education.

(Tr. 1409-11.)  For about thirteen years, she worked as a baker's assistant.  (Tr. 1411.)  Plaintiff

testified that since this time, she has been unable to work on a sustained basis due to her claimed

disabilities.  (Tr. 1411.)

### B.   <u>Claimed Disabilities</u>

Plaintiff claims that her disabilities include severe pulmonary problems, lower back

impairment, diabetes mellitus[3], gastroesophageal reflux disease (GERD), left heel spur, a hiatal

hernia[4], and depression.  (Tr. 21, 162, 187, 1381, 1412, 1414, 1417, 1418, 1420, 1425.)  Her

diabetes mellitus is characterized by persistent high sugar levels and sometimes a diabetic coma.

(Tr. 1415.)  Plaintiff testified that her severe GERD contributes to her breathing problems; and the

acid in her stomach sets off her breathing.  (Tr. 1417.)  Plaintiff testified that her diabetic

---

[3] "*Diabetes mellius* is a complex disorder that results from a deficiency or complete lack
of insulin secretion or resistance to insulin." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH
DICTIONARY, 511 (6th ed. 2002).

[4] "*Hiatal hernia* is protrusion of a portion of the stomach upward through the diaphragm.
The major symptom of this condition is gastroesophageal reflux." MOSBY'S MEDICAL, NURSING,
& ALLIED HEALTH DICTIONARY, 814 (6th ed. 2002).

neuropathy[5] and left heel spur cause numbness and pain in her feet and hands.  (Tr. 1415, 1418.)
Plaintiff asserted that her physical ailments prevent her from sitting for more than 20 minutes and
standing more than a half hour without pain.  (Tr. 1420, 1421.)

In addition, Plaintiff testified that she suffers from severe depression, caused by a history
of domestic abuse and emotional distress over the Department of Youth and Family Services'
("DYFS") removal of her daughter from her home.  (Tr. 1426.)   Plaintiff's depression
purportedly affects her sleep patterns, causes her anxiety, disorientation, and mood swings, and
necessitates her taking sleep medication and anti-depressants.  (Tr. 1426.)  Plaintiff also testified
that her depression affects her ability to interact with other people.  (Tr. 1427.)  She stated,
however, that she never experienced thoughts of suicide or a desire to harm herself.  (Tr. 1425.)

## C.  **Medical History**

Plaintiff's medical records from Holy Name Hospital in Teaneck, New Jersey, the Valley
Hospital in Ridgewood, New Jersey, and Hackensack Medical Center, between July 1995 and
August 2003, indicate that Plaintiff has an extensive history of asthma-related complications,
which often required emergency respiratory care.  (Tr. 202- 1379.)

### 1.  Dr. Robert P. Woonton's Examination

On February 6, 2000, Dr. Robert P. Wooton, a physician at Hackensack University
Medical Center, submitted a statement indicating that he treated Plaintiff on multiple occasions
for bronchial asthma.  (Tr. 422.)  Dr. Wooton diagnosed Plaintiff with chronic obstructive

---

[5] "*Diabetic neuropathy* is a non-inflammatory disease associated with diabetes mellitus
and characterized by sensory and/or motor disturbances in the motor system. Patients commonly
experience degeneration of sensory nerves and pathways." MOSBY'S MEDICAL, NURSING, &
ALLIED HEALTH DICTIONARY, 514 (6th ed. 2002).

pulmonary disease and referred Plaintiff to a pulmonologist for a pulmonary function evaluation. (Id.)

On August 9, 2000,  Dr. Orr, a physician at Hackensack University Medical Center, performed the Pulmonary Function Test and observed a "mild airway obstructive ventilatory defect without significant bronchodilator[6] response."  (Tr. 427.)  Dr. Orr also observed that Plaintiff's residual volume was increased due to air-trapping, but her diffusion capacity was normal.  (Id.)

In addition, Dr. Wooton submitted a Physician's Report, dated August 12, 2000, in which he reported that Ms. Silver's medical ailments included emphysema, bronchial asthma, lumbar radiculopathy (back pain), and chondromalacia[7] in the left knee.  (Tr. 431.)  Dr. Wooton concluded in his September 27, 2000 report that Ms. Silver suffered from a progressive and permanent disability, which often required ambulatory assistance.  (Tr. 428.)  Dr. Wooton also noted that Plaintiff's disabilities limited her ability to stand, walk, climb, stoop, bend, lift, and use her hands.  (Tr. 429.)  Dr. Wooton prescribed the following medications for Plaintiff's various ailments: Proventil, Atrovent, Serevent, Flovent, Prednisone, Prilosec, and Carafate.  (Tr. 845.)

---

[6] "*Brochidilator* is a substance often prescribed to improve aeration in asthma. A commonly used bronchodilator is albuterol." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 245 (6th ed. 2002).

[7] "*Chondromalacia* is a softening of cartilage." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 354 (6th ed. 2002).

6

2.      <u>Dr. John Villa</u>

On January 9, 2001, Dr. John Villa, a consultant for Hackensack University Medical Center, conducted a Polysomnography[8] Test to evaluate the cause of Plaintiff's snoring and claimed "choking" sensation while asleep.  Dr. Villa's report states that Plaintiff suffers from sinus tachycardia,[9] heavy and persistent snoring, increased intercostal EMG activity, paradoxical respiratory effort, severe apnea, obstructive hypopnea,[10] and desaturation.  (Tr. 444.)  Dr. Villa's recommendations included treatment of Plaintiff's snoring with increased upper airway resistance through an oral appliance or surgery.  (Tr. 445.)  Dr. Villa also recommended a medically supervised weight-loss program to assist Plaintiff in achieving her ideal body weight, as well as smoke cessation.  (<u>Id.</u>)

Following several emergency room visits, Dr. Villa again evaluated Plaintiff for her asthma, severe GERD, and other complications due to tobacco use.  Dr. Villa provided recommendations following his July 9, 2001 and November 11, 2001 consultations.  Dr. Villa again recommended that Plaintiff discontinue her tobacco use and implement behavior modification.  He also recommended increased medication compliance to improve Plaintiff's asthma and related impairments.  (Tr. 826, 846.)  While Dr. Villa recommended Plaintiff undergo

---

[8] *Polysomnography* is a diagnostic test in which a number of physiologic variables are measured and recorded during sleep to assess possible sleep disorders.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1370 (6th ed. 2002).

[9] "*Sinus tachychardia* is a rapid heart beat generated by the body's normal response to exertion, congestive heart failure, and pulmonary abnormalities."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1586 (6th ed. 2002).

[10] "*Hypopnea* is abnormally shallow and slow respiration."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 857 (6th ed. 2002).

surgery to correct her severe GERD, which impacts her asthma, he noted that Plaintiff should not undergo surgery until she stops smoking and discontinues her use of medically prescribed steroids.  (Tr. 859.)

3.      Dr. Michael Schmidt

Dr. Schmidt submitted a report in January 2001, indicating that he examined Plaintiff on three occasions between February 14, 2001 and February 21, 2001.  (Tr. 535.)  Dr. Schmidt noted Plaintiff's history of severe asthma.  (Tr. 535.)  On February 16, 2001, Dr. Schmidt performed a Gastroscopy[11] in connection with Plaintiff's gastroesophageal reflux disease.  Although no abnormalities were found in her esophagus, he did observe a small non-obstructive pyloric channel ulcer and a large hiatal hernia.  Dr. Schmidt recommended that Plaintiff continue taking her prescribed medications, and recommended laproscopic surgery to repair her hiatal hernia.  (Tr. 542.)  Dr. Schmidt also noted that from a gastrointestinal point of view, Plaintiff's condition would not render her permanently disabled..  (Tr. 536.)

4.      Dr. Sasan Michael Parangi

On August 6, 2002, Dr. Parangi completed a pulmonary residual functional capacity questionnaire and noted that, due to Plaintiff's severe asthma and related conditions, she is incapable of tolerating "low stress" jobs and her symptoms frequently interfere with her attention and concentration.  (Tr. 557.)  Dr. Parangi also observed that Plaintiff can sit no longer than 2 hours, stand no longer than 15 minutes, and must avoid all exposure to environmental factors such as fumes, dust, chemicals, extreme temperatures, cigarette smoke, and humidity.  (Tr. 558-59.)

---

[11] "*Gastroscopy* is a visual inspection of the stomach's interior by means of a scope inserted through the esophagus." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 245 (6th ed. 2002).

Dr. Parangi reported that overall, Plaintiff's impairments will last at least twelve months, and that emotional factors do not contribute to the severity of her symptoms.  (Tr. 557.)

     5.    <u>Dr. Paul E. Schneck</u>

Dr. Schneck's January 12, 2004 psychiatric report indicates that Plaintiff has a long history of being the victim of physical and verbal abuse.  (Tr. 1381.)  When depressed, Plaintiff becomes tearful, unable to sleep, and experiences a loss of appetite  (Tr. 1381.)  Dr. Schneck summarized Plaintiff's trauma from domestic abuse and DYFS' removal of her daughter from her home as "an acute depressive episode in a long-term psychiatric disorder."  (Tr. 1382.)  Dr. Schneck's overall diagnostic impression indicates Plaintiff suffers from a major recurrent depressive disorder and had a former alcohol dependence.  To reduce or eliminate Plaintiff's symptoms of anxiety and depression, Dr. Schneck prescribed the following medications: Lexapro, Ambien for insomnia, and Aprozolam for anxiety.  (Tr. 1384.)  Dr. Schneck also recommended Plaintiff maintain psychotherapy appointments, and return for a monthly medication evaluation.  (Tr. 1385.)  Prior to this psychiatric evaluation, Plaintiff was last hospitalized for severe depression in 1979.  (Tr. 1382.)

Plaintiff's initial psychotherapy appointment was held on January 30, 2004.  (Tr. 1386.)  Dr. Schneck's treatment notes describe Plaintiff's account of a recent physical attack by her boyfriend and the fear she experienced after this attack.  (Tr. 1386.)  Dr. Schneck indicated Plaintiff was relaxed, and spoke spontaneously and in an organized manner.  (Tr. 1387.)  His report further indicates that DYFS was "not bothering" Plantiff at the time. (Tr. 1387.)  Plaintiff told Dr. Schneck that she stopped taking Lexapro, because she began "feeling unsteady."  (Tr. 1387.)

Plaintiff missed her February 13, 2004 appointment.  (Tr. 1388.)  At Plaintiff's February 19, 2004 appointment, however, she indicated that she was having problems with DYFS and was experiencing insomnia.  (Tr. 1388.)  Dr. Schneck described Plaintiff's mood on February 19, 2004 as anxious.  (Tr. 1388.)

Plaintiff missed her appointment on February 23, 2004.  At her next appointment, on April 5, 2004, however, Plaintiff revealed that DYFS had removed her daughter from her home on February 23, 2004, and had placed her in foster care.  (Tr. 1388.)  At this appointment, Plaintiff described another physical attack by her boyfriend that took place on March 8, 2004.  (Tr. 1388.)  Dr. Schneck observed that Plaintiff's speech was organized and goal directed, that she had no psychosis, and that her behavior was appropriate. (Tr. 1388.)

Plaintiff missed her appointments on April 6, 2004 and May 17, 2004.  (Tr. 1389.)

On May 19, 2004, Plaintiff called Dr. Schneck's office seeking pain medication.  (Tr. 1389.)  The office staff informed Plaintiff that they do not prescribe pain medication and referred Plaintiff to her primary physician.  (Tr. 1389.)  Plaintiff missed several regularly scheduled psychotherapy appointments between the dates of June 8, 2004 and July 21, 2004.  (Tr. 1389 - 95.)  During this time, Plaintiff called Dr. Schneck's office numerous times requesting refills of her psychiatric medications.  Treatment notes indicate that Plaintiff often harassed office staff when they refused to refill her medication on a call-in basis, and instead required her to first come to the office for an appointment.  (Tr. 1389 - 95.)  Substance abuse counseling was often recommended following Plaintiff's phone calls.  (Tr. 1391.)

On July 23, 2004, Plaintiff attended a psychotherapy appointment.  (Tr. 1396.)  Dr. Schneck's treatment notes indicate that Plaintiff's daughter was still in foster care, and that her

diabetes was uncontrollable.  (Tr. 1396.)  Dr. Schneck observed that Plaintiff's mood was appropriately responsive in that "she was able to smile and laugh while realizing her physical ailments."  (Tr. 1396.)  Dr. Schneck did not observe any psychosis or suicidal behavior.  (Tr. 1396.)

On August 23, 2004, Dr. Schneck noted that Plaintiff had experienced some problems with DYFS, and was hospitalized three times at Hackensack Medical Center for her diabetes and asthma.  (Tr. 1397.)  Plaintiff also complained of depression, crying spells, and enormous stress. (Tr. 1397.)  Dr. Schneck noted that Plaintiff's mood was anxious, and that her speech was very rapid. (Tr. 1397.)   Dr. Schneck further observed that Plaintiff showed no signs of hallucinations, and was not delusional, paranoid, or suicidal.  (Tr. 1397.)

 Plaintiff missed several other appointments between the dates of August 31, 2004 and October 19, 2004.  (Tr, 1397.)

6.     State Medical Expert Dr. Harold Bernanke

Medical expert Dr. Harold Bernanke testified at the December 9, 2004 hearing based on his review of Plainitff's medical records.  (Tr. 1428.)  Dr. Bernanke testified that Plaintiff has a 18 to 20 year history of asthma and numerous emergency room visits for treatment of this condition. (Id.)  Dr. Bernanke concluded that a portion of Plaintiff's asthma problem was due to lack of "compliance with medication."  (Id.)  Dr. Bernanke specifically noted that Plaintiff signed out of the hospital on two or three occasions in 2001, lacked an "understanding of how to use medications, and continued to smoke."  (Id.)  Although Dr. Bernanke confirmed that Plaintiff has severe asthma and frequent upper respiratory infections that exacerbate her asthma, he also testified that the number of Plaintiff's emergency room visits would have been less if she had "a

relationship with a treating physician." (Tr. 1429.)  Dr. Bernanke believed that establishing a relationship with a treating physician would "offset the need for so many visits to the ER."  (Id.) Dr. Bernanke also testified that "if one accepts literally the number of visits [Plaintiff] had to the emergency room, her medical impairments would probably equal the listings." (Tr. 1433.)  Dr. Bernanke, however, concluded that Plaintiff's lack of compliance with medical treatment contradicts this objective data.  (Id.)

As respects Plaintiff's gastrointestinal complaints, Dr. Bernanke testified that the tests indicated that Plaintiff has a hiatal hernia and ulcer in her pyloric channel, which contribute to her GERD.  (Tr. 1429.)   Dr. Bernanke further found, however, that Plaintiff was treated for GERD, has "no history of any associated gastrointestinal bleeding, [and the record indicated only] very mild abnormalities of the liver."  (Tr. 1430.)

Regarding Plaintiff's complaints of lower back pain, Dr. Bernanke noted that no abnormalities were found on Plaintiff's x-rays.  (Id.)  Dr. Bernanke referenced medical notes indicating that Plaintiff had reasonably good straight leg raises of 60 degrees. (Tr. 1431.)

Dr. Bernanke also testified regarding Plaintiff's complaint of knee pain.  Dr. Bernanke noted that Plaintiff was previously stabbed in her knee and treated for this injury, but developed some infection during the course of treatment.  (Tr. 1430.)  Dr. Bernanke also addressed Plaintiff's complaint of a left heel spur, and noted that the radiographic examination of her foot did not indicate any signs of a fracture or heel spur.  (Tr. 1430-31.)   Dr. Bernanke concluded that even if Plaintiff suffered from a heel spur, this disorder is not permanent and generally lasts six to eight weeks. (Tr. 1441.)

Dr. Bernake also addressed Plaintiff's complaint of diabetic neuropathy.  Dr. Bernanke noted that if Plaintiff truly suffered from diabetic neuropathy, her medical records would indicate signs of "sensory abnormalities."  (Tr. 1431.)  Dr. Bernanke found that Plaintiff had no such sensory abnormalities.  (Tr. 1431.)  Dr. Bernanke did not totally discredit Plaintiff's complaints of diabetic neuropathy, because he did not have any treatment notes regarding Plaintiff's diabetic management.  (Tr. 1432.)  Dr. Bernanke noted that the large dosages of Prednisone that Plaintiff is required to take daily "certainly could bring on [diabetes], and with that she could have complaints of neuropathy as one of the complications."  (Id.)  Dr. Bernanke also expressed concern that the high dosage of Prednisone Plaintiff took was exacerbating her already high blood pressure.  (Id.)  Dr. Bernanke noted that Plaintiff's medications also include Singulair, insulin, and bronchodilators to manage her asthma.  (Tr. 1433.)

Dr. Bernanke further testified that Plaintiff's pulmonary function test results were within normal limits and "certainly do not meet the listings of the Social Security Administration."  (Tr. 1429.)  Dr. Bernanke specifically noted that the results from Plaintiff's August 2004 Pulmonary Function Test (PFT) did not meet the requirements of the listings. (Tr. 1433-36.)  Dr. Bernanke particularly noted that the PFT did not indicate that Plaintiff suffers from an obstructive pulmonary disease.  (Tr.1436.)  Dr. Bernanke testified that if Plaintiff suffered from an obstruction, the medical records would reflect signs of improvement resulting from her use of bronchodilators.  (Tr. 1436.)  Plaintiff 's record demonstrates no response to bronchiodilators. (Tr. 1435-36.)  Dr. Bernanke concluded that the values indicated on Plaintiff's PFT would improve if she stopped smoking, and that her overall test results were not attributable to an obstructive pulmonary disease.  (Tr. 1437.)

13

With respect to Plaintiff's diabetes, Dr. Bernanke testified that although her blood sugar levels were abnormal, they were not "significantly out of line for a patient with diabetes." (Tr. 1438.)

ALJ Lee asked Dr. Bernanke to assess Plaintiff's residual functional capacity. (Tr. 1441.) In response, Dr. Bernanke concluded that "on an objective basis, [Plaintiff] could do sedentary work," but that he did not think she was otherwise "really employable." (Tr. 1441.) Dr. Bernanke also noted that Plaintiff had psychiatric complaints, but that Plaintiff's psychiatric records were not available for his review at the time of the hearing.[12] (Id.)

7.    State Vocational Expert Donald Slive

Vocational expert Donald Slive also testified at the December 9, 2004 hearing. (Tr. 1442-1448.) ALJ Lee asked Slive to describe Plaintiff "in terms of her vocational factors, age, education, and work background." (Tr. 1442.) In response, Slive noted that Plaintiff was born February 20, 1960 and has a tenth grade education. (Id.) Slive also noted that Plaintiff had worked as a bakery worker, a position which "requires a heavy physical demand [but] is unskilled." (Tr. 1443.)

ALJ Lee then posed a series of hypothetical questions to Slive to determine what type of work Plaintiff could now perform. ALJ Lee asked Silve whether an individual with the described vocational factors and a residual functional capacity to perform sedentary work, as long as this work avoids exposure to specific environmental factors, "would . . . be able to do any work at all."

---

[12]Although Plaintiff's psychiatric records were not available for review at the time of the hearing, ALJ Lee noted that he would keep the hearing record open for Plaintiff to submit additional records. (Tr. 1448.) Plaintiff's psychiatric records were submitted and received into record in February 2005. (Tr. 1380.)

(Id.)  Slive responded that this person would be able to perform three types of jobs. (Tr. 1443-44.) Slive stated that Plaintiff could perform the job of surveillance systems monitor (5,300 of these jobs exist in the national economy and 320 exist in the regional economy).  (Tr. 1444.)  Slive also testified that Plaintiff could perform the job of a charge account clerk (2,800 of these jobs exist in the national economy and 168 exist in the region).  (Id.)  Last, Slive noted that Plaintiff could work as a document preparer (there are 3,300 of these jobs in the national economy and 219 in the region). (Id.)

### III.  DISCUSSION

**A.      Standard of Review**

        This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing, Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom.

Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence that may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.      Statutory Standards**

_____The claimant bears the initial burden of establishing his or her disability. 42 U.S.C.§ 423(d)(5). To qualify for DIB or SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled." 42 U.S.C. § 1381. A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); see

16

also Nance v. Barnhart, 194 F. Supp.2d 302, 316 (D. Del. 2002).  Finally, while subjective

complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. §

423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical,

physiological or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.**     **The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step

process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity.[13]  20 C.F.R. §

404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled"

and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  At step

two, the Commissioner must determine whether the claimant is suffering from a severe

impairment.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it "significantly limits

[a claimant's] physical or mental ability to do basic work activities."  Id.  In determining whether

the claimant has a severe impairment, the age, education, and work experience of the claimant

will not be considered.  Id.  If the claimant is found to have a severe impairment, the

Commissioner addresses step three of the process.  At step three, the Commissioner compares the

medical evidence of the claimant's impairment(s) with the impairments presumed severe enough

to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R.

§ 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments,

---

[13] Substantial gainful activity is "work that involves doing significant and productive
physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

17

he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[14] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that an ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," but must merely ensure "that there be sufficient explanation to provide meaningful review of the step-three determination."  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 Fed. Appx. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past

---

[14] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

18

work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a

significant number of jobs that claimant can perform, claimant will not be found disabled.  Id.

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step

process, "must analyze the cumulative effect of the claimant's impairments in determining

whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422,

428 (3d Cir. 1999).  Moreover, "the combined impact of the impairments will be considered

throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523;

Parker v. Barnhart, 244 F. Supp.2d 360, 369 (D. Del. 2003).  However, the burden still remains on

the Plaintiff to prove that the impairments in combination are severe enough to qualify him for

benefits.  See Williams v. Barnhart, 87 Fed. Appx. 240, 243 (3d Cir. 2004) (placing responsibility

on the claimant to show how a combination-effects analysis would have resulted in a qualifying

disability); see also Marcus v. Barnhart, 2003 WL 22016801 at *2 (E.D. Pa. Jun. 10, 2003)

(stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments

limited one of the basic work abilities").

**D.     ALJ Lee's Findings**

ALJ Lee applied the five-step evaluation process to determine that Plaintiff was not

disabled within the meaning of the Act.  (Tr. 26.)  ALJ Lee found that Plaintiff satisfied the first

step of the evaluation process, given that Plaintiff has never engaged in substantial gainful

activity.  (Tr. 21.)

At step two of the evaluation, ALJ Lee concluded that Plaintiff has " a combination of

severe impairments that limit Plaintiff's ability to engage in basic work-related activities."  (Tr.

22.)  ALJ Lee found that Plaintiff's severe impairments include asthma, diabetes mellitus, heel

spurs, gastrointestinal problems, a hernia, an ulcer, and  hypertension.  (Id.)  ALJ Lee did not

discuss whether Plaintiff's claimed disability of multiple depressive symptoms qualified as severe. (Id.)

At step three, ALJ Lee found that Plaintiff's "medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1" of 20 C.F.R. Part 404, Subpart P. (Tr. 26.)  ALJ Lee agreed with the findings of the state agency physician, Dr. Harold Bernanke, which indicated Plaintiff's medical record did not support a finding that Plaintiff's exertion limitations significantly precluded her from engaging in sedentary activities. (Tr. 23.)  In his conclusion, ALJ Lee gave great weight to Dr. Bernanke's finding that Plaintiff "had a history of non-compliance with [her] prescribed" asthmatic treatment regiment. (Id.) ALJ Lee made no finding regarding whether Plaintiff's claimed mental disability satisfies the medical criteria of any impairment found in the Listings, however. (Id.)

In step four and five of the evaluation, ALJ Lee found that, while Plaintiff has no past relevant work experience, Plaintiff has the residual functional capacity to perform sedentary work, as long as she avoids exposure to dust, fumes, irritants, chemicals, and extreme temperatures. (Tr. 25.) ALJ Lee found Plaintiff's non-compliance with medical treatment "significant, in that she continues to smoke and declined inpatient hospitalization on three occasions." (Tr. 24.) ALJ Lee noted that when Plaintiff did maintain compliance, the state agency physician, Dr. Bernanke, found that her pulmonary function test was within normal limits. (Id.) ALJ Lee also determined from Dr. Bernanke's testimony that Plaintiff's GERD did not severely limit her residual functional capacity. (Tr. 24.)

ALJ Lee believed that Plaintiff's diabetes mellitus is not significant, because Plaintiff "has not received any ongoing formal treatment," and laboratory tests indicated her glucose levels, while still somewhat high, decreased between May 2004 and September 2004. (Id.) ALJ Lee

considered Plaintiff's claims of back problems, and concluded that Plaintiff's medical records indicated only mild degenerative changes.  (Id.)  He further noted that Plaintiff had not received any ongoing treatment for this complaint.  (Id.)  ALJ Lee discounted Plaintiff's complaint of left heel pain, because she did not seek medical assistance for this complaint until May 2004, and her foot x-ray was  negative.  (Tr. 24.)

ALJ Lee was not convinced by Dr. Wooton's diagnosis, which found that Plaintiff suffered from chronic obstructive pulmonary disease and bronchial asthma.  Although Dr. Wooton provided a medical report stating Plaintiff's pulmonary condition was a permanent disability, he treated and diagnosed Plaintiff during her continued tobacco use.  (Tr. 25.)

ALJ Lee also concluded that Plaintiff's mental limitations do not prevent her from performing sedentary work. (Id.)  Although, Dr. Schneck, who examined Plaintiff's mental status, concluded Plaintiff has a major recurrent depressive disorder and a former alcohol dependence, ALJ Lee found support for his conclusion in Dr. Schneck's treatment notes regarding Plaintiff's behavior.  (Id.)  The ALJ took into account that Plaintiff had been sober since 1997.  (Id.)  He also noted that Plaintiff has not exhibited compliance with her mental health treatment.  The record indicates Plaintiff missed appointments, abused her prescribed psychiatric medication, and threatened the office staff when they did not refill her medication.  (Id.)

ALJ Lee also relied on vocational expert Donald Slive's testimony as evidence that Plaintiff can perform significant sedentary work in the local and national economy.  (Id.)  ALJ Lee posed a series of hypothetical questions to vocational expert Slive.  (Id.)  ALJ Lee's questions specifically described a hypothetical individual, such as Plaintiff, "who was a younger [individual], completed the tenth grade, and had no relevant work history."  (Id.)  ALJ Lee also

21

noted that this hypothetical individual had the residual functional capacity to perform work, as long as it avoided exposure to pollutants, fumes, dust, chemicals, and temperature extremes  (Id.)

Vocational expert Slive responded that such a person could perform the job of surveillance systems monitor, charge account clerk, and document preparer.  (Tr. 1444.)  Mr. Slive also concluded that these jobs existed in significant numbers in the local and national economy (Id.)

**E.     Analysis**

Plaintiff contends that ALJ Lee's decision should be reversed and remanded because it is not supported by substantial evidence.  (Pl.'s. Mem. L. at 18.)  Plaintiff contends that: (1) ALJ Lee erred in making no finding regarding the severity of Plaintiff's mental impairments, specifically whether Plaintiff's mental impairments meet one of the listed impairments in Appendix 1, or if not listed, whether her mental impairments affect her ability to perform work (Pl.'s Reply Mem. L. at 1); and (2) ALJ Lee erred in relying on vocational expert Donald Slive's testimony to establish Plaintiff is capable of performing work that exists in significant numbers in the national economy (Pl. Mem. L. at 10).

1.     Did the ALJ Err in Not Making Findings Regarding the Severity of Plaintiff's Mental Impairments?

Plaintiff claims that ALJ Lee failed to analyze properly whether Plaintiff's mental impairments equal or meet one of the listings or affect her ability to perform work.  In assessing the severity of the claimants mental impairments, the ALJ's written decision must incorporate an analysis of his findings and conclusions based on the psychiatric review technique.[15]  20 C.F.R. §

_____

[15]While the Third Circuit noted that under the revised criteria for evaluating mental disorders, the ALJ is no longer required to complete a separate psychiatric review technique form, the ALJ's written decision must document application of this technique. Izzo v. Comm'r of Soc. Sec., 2006 U.S. App LEXIS 16282, *13 (3d Cir. 2006); 20 C.F.R § 416.920a(e); Nunes v.

416.920a(e)(2).  The psychiatric review technique requires an evaluation of a "claimant's mental impairments in four broad functioning areas:  (1) activities of daily living, (2) social functioning, (3) concentration, persistence or pace, and (4) deterioration or decompensation in work or work-like settings."  Ramirez v. Barnhart, 372 F.3d 546, 551 (3d Cir. 2006); 20 C.F.R. § 146.920a(c)(3).

Before the ALJ must apply the technique, Plaintiff bears the burden of demonstrating that she has a medically determinable mental impairment.  20 C.F.R.§ 146.920a(b).  Accordingly, Plaintiff's subjective complaints of depression alone are not enough to establish a mental impairment; there must also be medical signs and laboratory findings demonstrating mental impairments.  20 C.F.R § 416.908.   Here, Plaintiff proffered medical evidence from Dr. Paul E. Schneck, who treated her for complaints of depression and anxiety.  As ALJ Lee specifically noted, Dr. Schneck concluded in a mental status exam that Plaintiff suffers from "a major recurrent depressive disorder" and former alcohol dependence.  (Tr. 25, 1385.)

In Izzo v. Comm'r of Soc. Sec, the Third Circuit affirmed the ALJ's conclusion that claimant's subjective complaints of a mental impairment were not supported by medical evidence and did not meet or equal one of the listings, where the psychiatrist's evaluation noted claimant "did not suffer from a major psychiatric pathology."  Izzo, 2006 U.S. App. LEXIS 16282, at *13 (3d Cir. 1999).   By contrast, here Dr. Schneck's finding of a major recurrent depressive disorder corroborates Plaintiff's subjective complaints.

While the ALJ can reject subjective complaints of impairment when he does not find them credible, the ALJ is required to accord significant weight to such claims when they are supported

_____

Barnhart, 2006 U.S.Dist. LEXIS 5169 (E.D. Pa. 2006).

by competent medical evidence.  Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).  In this case, Plaintiff's complaints of mental impairment appear to be supported by competent medical evidence, but were summarily disregarded by ALJ Lee without explanation.

ALJ Lee found that Dr. Schneck's findings of a major recurrent depressive disorder were in conflict with other treatment notes, which indicate Plaintiff missed several psychotherapy appointments and abused her medication.  (Tr. 25.)  The Third Circuit held in Kent v. Schweiker, however, that an  ALJ's determination is not based on substantial evidence when the ALJ's primary basis for  rejecting the severity of plaintiff's subjective complaints of pain was the claimant's "failure to visit her physician more frequently."  Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983).

The ALJ's finding is insufficient because his written decision provides no explanation for his conclusion that Plaintiff's alleged mental impairments have no effect on her residual functional capacity to perform sedentary work.  (Tr. 25.)  "While  the ALJ  is, of course, not bound to accept physicians' conclusions, he may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected". Id., (citing, Cotter v. Harris, 642 F.2d 700, 705-06 (3d Cir. 1981) (holding in order for the appellate court to perform its statutory function of judicial review, the Third Circuit rule is that the ALJ must specify the reasons for his conclusion).  Although ALJ Lee concluded that Plaintiff's non-compliant medical behavior contradicts her subjective complaints,  without a statement of ALJ Lee's reasoning, his mere conclusory statement is beyond meaningful judicial review.  Williams v. Comm'r of Soc. Sec., 156 Fed. Appx. 501, 504 (3d Cir. 2005) (requiring that "when an ALJ is confronted with contradictory evidence, the ALJ must explain his reasons for accepting certain evidence and rejecting or discounting other evidence");

24

Burnett, 220 F.3d at 120 (remanding the case where the ALJ gave a conclusory statement regarding claimant's impairment and  failed to discuss the evidence and explain his "conciliations and rejections").

In her brief, the Commissioner argues that no explanation was needed for rejecting the evidence of Plaintiff's mental impairment, because "Dr. Schneck's findings were essentially unremarkable."  (D's Mem. L. at 7.)  The Commissioner attempts to support this argument by highlighting Dr. Schneck's treatment notes which indicate that Plaintiff was casually groomed; displayed appropriate and sometimes cheerful affect; had a good general fund of knowledge; spoke in an organized and goal-oriented manner; and had no hallucinations, delusions or suicidal ideation or paranoid thoughts.  (Id.)  The record, however, also contains psychotherapy treatment notes, which reflect Plaintiff's complaints of insomnia, depression, agitation, crying spells and Dr. Schneck's observation of Plaintiff's anxiety.  (Tr. 1388, 1396, 1397)  In particular, at Plaintiff's August 23, 2004 appointment, Dr. Schneck described Plaintiff's mood as anxious and stressed. (Tr. 1397.)

Without citing to the record, the Commissioner also drew an adverse inference from the fact that Plaintiff did not complain of a mental impairment when she submitted her application for social security income in 2000; did not allege disability due to mental impairment at the first administrative hearing; and did not seek mental health treatment until January 12, 2004.  (Def.'s Mem. L. at 6).   The Commissioner concludes from this evidence, that Plaintiff did not meet her burden in establishing a severe mental impairment.  (Id.)  Dr. Schneck's psychiatric evaluation, however, indicates that the factors that directly contributed to Plaintiff's depression and anxiety did not escalate until late 2003.  Specifically, Plaintiff's boyfriend attempted to kill her by

strangling her with a phone cord on October 22, 2003; he broke into her home on several occasions after his release from prison; and DYFS removed Plaintiff's daughter from the home and into foster care on February 23, 2004. (Tr. 1381.) Plaintiff testified regarding her anxiety and depression at the December 9, 2004 administrative hearing. (Tr. 1425.) While the ALJ retains the discretion to accept or not accept Dr. Schneck's report, in light of this conflicting evidence, the ALJ must develop the record to explore the extent to which Plaintiff's mental limitations impair her ability to maintain gainful employment

Even if ALJ Lee can provide a sufficient basis for discounting Plaintiff's mental impairment, his evaluation still falls short because he did not consider Plaintiff's mental impairments at the proper stage of the sequential evaluation process. The criteria in the psychiatric review technique are not used to assess Plaintiff's residual functional capacity, "but are used to rate the severity of mental impairment(s) at steps two and three of the sequential evaluation process." Ramirez, 372 F.3d at 551; 20 C.F.R. § 416.920a(a)(1). ALJ Lee did not address Plaintiff's mental impairment until stage four of the sequential evaluation process. (Tr. 25.) Moreover, as the Commissioner admits, even at stage four, Plaintiff's claims of mental impairment were not evaluated under the psychiatric review technique, as required under 20 C.F.R. § 416.920a. (Def.'s Mem. L. at 8.)

For these reasons, this matter must be remanded for further consideration by the ALJ. On remand the ALJ should analyze Plaintiff's mental limitations according to the psychiatric review technique with specific reference to the severity of Plaintiff's mental impairments and whether or not her alleged impairments meet or equal one of the impairments in the Listings. In addition, the

ALJ must give specific reasons for rejecting or accepting the evidence submitted regarding Plaintiff's mental impairments._____

      2.    Did ALJ Lee Err in Relying on the Vocational Expert's Testimony in Finding that Plaintiff is Capable of Performing Work that Exists in Significant Numbers?

Plaintiff also contends that ALJ Lee's determination should be reversed because his failure to assess Plaintiff's mental impairment under the psychiatric review technique affected the merit of vocational expert Donald Slive's testimony.  At step five of the sequential evaluation process, the Commissioner bears the burden of demonstrating that other jobs exist in significant numbers in the national economy, which claimant can perform consistent with claimant's medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).

ALJ Lee relied on vocational expert Slive's testimony as evidence that Plaintiff can perform significant work in the local and national economy.  In an effort to determine what type of work Plaintiff can perform, ALJ Lee posed a series of hypothetical questions to Slive.  (Tr. 25.) The hypothetical questions described an individual, such as Plaintiff, who was born February 20, 1960, completed the tenth grade, had no relevant work experience, and retained the residual functional capacity to perform sedentary work, as long as this work avoids exposure to pollutants, fumes, dusts, odors, gases, chemicals, humidity and temperature extremes.  (Tr. 25, 551, 1443.) Slive responded that such a person could perform the jobs of surveillance systems monitor, charge account clerk, and document preparer.  (Tr. 1444.)

Plaintiff argues the hypothetical question failed to include Plaintiff's claimed impairment of depression.  This Court's task is to determine whether there is substantial evidence to support

27

ALJ Lee's decision to exclude Plaintiff's alleged mental impairment.  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The hypothetical questions to a vocational expert must reflect all of a claimant's impairments supported by the record, otherwise the expert's testimony cannot be considered substantial evidence.  Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004), citing, Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  In other words, it is an error to rely on a vocational expert's testimony if the hypothetical does not accurately portray the individual's physical and mental impairments.  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984); see also Winters v. Barnhart, 153 Fed. Appx. 846, 848 (3d Cir. 2005) (holding ALJ's decision was not supported by substantial evidence, because the ALJ erred in relying on vocational expert's testimony which failed to take into account claimant's mental impairments).  Thus, ALJ Lee would only be required to include Plaintiff's claimed mental impairment in the hypothetical to Slive if this impairment was found to be supported by the record.  But see Santiago-Rivera v. Barnhart, 2006 U.S. Dist. LEXIS 69559 at 20, 35-36   (3d Cir. 2006)(holding that the hypothetical to a vocational expert did not require greater specificity of claimant's mental impairments, where the record did not support a conclusion that Plaintiff suffered from a mental impairment that affected her functional limitation.)

_____As this Court has explained, however, ALJ Lee failed to evaluate Plaintiff's mental impairment properly under the psychiatric review technique at step two and three of the sequential evaluation process.  The Third Circuit previously ruled that although the findings from the psychiatric review technique are relevant to steps two and three of the sequential evaluation process, they also play a role in steps four and five.  Ramirez v. Barnhart, 372 F.3d 546, 555 (3d Cir. 2004).  Without this evaluation, therefore, it necessarily follows that a question remains

regarding the severity of Plaintiff's claimed mental impairments and whether this impairment should have been included in the hypothetical posed to vocational expert Slive.

In <u>Izzo v. Comm'r of Soc. Sec.</u>, 2006 U.S. App . LEXIS 16282,  at *11, 18 (3d Cir. 2006), the ALJ properly excluded the Plaintiff's subjective complaints of mental impairment in the hypothetical posed to the vocational expert, where medical evidence did not support the claimant's alleged mental limitations and adequate consideration was given to the severity of claimant's alleged mental impairments. <u>Id.</u> at * 11.

Unlike <u>Izzo</u>, here, adequate consideration was not given to the severity of Plaintiff's alleged mental impairments; even though, Plaintiff proffered medical evidence by Dr. Schneck that she suffered from a major recurrent depressive disorder.

Without proper application of the psychiatric review technique, this Court cannot make a finding regarding whether the ALJ was required to include any functional limitations caused by Plaintiff's mental impairments in his hypothetical to the vocational expert.  Thus, this case must be remanded so that proper consideration can be given to the extent of Plaintiff's alleged mental impairments and the limitations they pose on her ability to work.

## IV.  CONCLUSION

For the reasons stated above, this Court finds that the ALJ's decision is not supported by substantial evidence and must be reversed.  This case is remanded for further consideration consistent with this Court's opinion.

Dated: January 16, 2007                       _____s/ Joseph A. Greenaway, Jr._____
                                                                  JOSEPH A. GREENAWAY, JR., U.S.D.J.